RAY OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 34332, 43123, 45219, 48015, 61554. Promulgated August 22, 1933.

*A. E. Hill, Esq.,* and *J. G. Beavers, C. P. A.,* for the petitioner.
*W. R. Lansford, Esq.,* for the respondent.

OPINION.

MATTHEWS: 1. The first proceeding, Docket No. 34332, arises on a deficiency of $1,105.94 in income tax for the calendar year 1923 and involves the sole question, whether the petitioner was taxable in that year as a trust or as an association under section 2 (2) of the Revenue Act of 1921. The petitioner invoked the aid of section 704 (a) of the Revenue Act of 1928, set out in the margin.[1] The rulings of the Commissioner referred to in this section are those cited in *E. A. Landreth*, 15 B.T.A. 655; *Wilkins & Lange*, 15 B.T.A. 1183; *Woodrow Lee Trust*, 17 B.T.A. 109; and *Van Cleave Trust*, 18 B.T.A. 486; and are predicated upon the control test laid down by the Supreme Court in *Crocker* v. *Malley*, 249 U.S. 223. In the *Landreth* case at 667, we said:

\* \* \* It is sufficient to say that beginning in the year 1919 and up to and including the period July-December, 1922, the Bureau of Internal Revenue was consistently ruling that irrespective of whether the taxpayer was engaged in business under the corporate forms, it was taxable as a trust in all cases where the shareholders could not control the actions of the trustees.

In the *Van Cleave* case we held that the same test applied as late as July 1, 1924.

Here the three trustees held the legal title to the trust property, their liability and that of the beneficiaries being limited to this property. The trust instrument was duly recorded and notice was held out to the public that petitioner was operating as a trust. The trustees were given " absolute control, management and disposition without giving bond." They held an annual meeting and designated certain of their number as officers. The trustees might alter the amount of shares within a certain fixed minimum. Two of the three trustees at any meeting could take valid action. They alone might appoint their successors. The shareholders held no meeting and exercised no powers. They had no legal title in the trust property nor any right to its partition or to dissolution of the trust. The shareholders' beneficial interest was to be represented by transferable certificates.

---

[1] SEC. 704. TAXABILITY OF TRUSTS AS CORPORATIONS—RETROACTIVE.

(a) If a taxpayer filed a return as a trust for any taxable year prior to the taxable year 1925 such taxpayer shall be taxable as a trust for such year and not as a corporation, if such taxpayer was considered to be taxable as a trust and not as a corporation either (1) under the regulations in force at the time the return was made or at the time of the termination of its existence, or (2) under any ruling of the Commissioner or any duly authorized officer of the Bureau of Internal Revenue applicable to any of such years, and interpretative of any provision of the Revenue Act of 1918, 1921, or 1924, which had not been reversed or revoked prior to the time the return was made, or under any such ruling made after the return was filed which had not been reversed or revoked prior to the time of the termination of the taxpayer's existence.

The purpose of petitioner was to prospect for oil and gas lands and to sell them. It sunk two wells and then sold the leases and collected on the royalties. Nothing whatever appears in the evidence to indicate any interference by the shareholders with the conduct of the enterprise by the trustees. The trustees collected the royalties and distributed them to the shareholders. They were given full power to invest, reinvest. or otherwise dispose of trust funds.

In such circumstances it does not require argument to show that the trustees in this proceeding, as we said of trustees in a similar situation in *Twin Bell Oil Syndicate*, 26 B.T.A. 165, " were here the real masters of the situation, unchecked by the veto of the holders of the beneficial interest."

As the petitioner filed a return as a trust on March 16, 1924, we are of the opinion that for the year 1923 it comes within the operation of the remedial provision and is entitled to its benefit.

2. Dockets 43123, 45219, 48015, and 61554, for the respective years of 1926, 1927, 1928, and 1929, raise the same issue as the proceeding for 1923, the only difference being that with respect to the latter years, the petitioner may not avail itself of section 704 (a) of the Revenue Act of 1928; and we must determine the question under the principles laid down by the Supreme Court in *Hecht* v. *Malley*, 265 U.S. 144, and subsequently decided cases. *Twin Bell Oil Syndicate,* 26 B.T.A. 172, 175; *Morriss Realty Trust*, 23 B.T.A. 1076, 1083.

The petitioner relies strongly on our decision in *Extension Oil Co.*, 16 B.T.A 1028; affd., 47 Fed. (2d) 65, contending that the present case is almost on all fours with that case. We agree with this contention. There are enough resemblances in essentials in the present case to bring it within the *Extension Oil Co.* decision. We have already pointed out that the trustees were empowered to act and did act independently of any control by the shareholders. Control by the trustees is not, however, enough.

The purposes of the trust as set out in the instrument of trust were various and comprehensive, generally to lease and purchase gas and oil rights; to carry on all necessary operations in the development of oil wells and the sale of oil; to acquire and operate under franchises for the sale of gas, electricity and water, and to deal in stocks and bonds. That these purposes had no real relation, however, to the intentions of the seven men who organized the petitioner, appears from the testimony of the secretary and the treasurer of petitioner (also an original trustee) who said, in answer to the question why those provisions were put in:

The witness: We had an attorney draw up that trust agreement for us. We did not state just what we wanted, other than that we did not want to be

bound to some individual obligation of somebody who might be a certificate holder in the company. That perhaps was just some form the attorney fixed up. I don't know just why all that was put in there. It never was intended to do all those things.

Q. And you state that you did not do them?

A. No, we did not.

Q. Your operations were confined to what?

A. Well, we controlled two wells there and since have just been holding our royalty interest, and collecting and distributing the money that accumulates.

The actual operations of the petitioner were confined, as stated in the testimony above, to sinking two oil wells which the trustees sold in the same year to the Magnolia Petroleum Co.; and after the sale, to collecting the royalty. As to petitioner's other activities it appears that one royalty was bought by the petitioner with trust money requiring reinvestment, but apparently the trustees carried on no further operations of any kind and merely collected royalties and distributed them to the beneficiaries. The sinking of the two original wells is explained apparently on the ground that the territory owned by the petitioner was "wildcat", that is to say, unproven, and until oil was struck the probability of disposing of it on a royalty basis was not large.

We may safely conclude, therefore, notwithstanding the purposes of general business operation set forth in the trust declaration, that the business purpose was strictly limited, and that the actual operations after 1923 amounted to scarcely more than the passive receipt of income from the trust's investments.

The facts of the *Extension Oil Co.* case, as stated by the circuit court, were as follows:

Five men, owning an oil and gas lease which was about to lapse unless drilled, in order to realize on the property trusteed the land in the name of the Extension Oil Company, and in the declaration of trust they named four of the five as trustees, declared "the trust estate hereby created shall be divided into 400 units," provided for the sale of the units, the drilling on the property by the Extension Oil Company, gave the trustees full power to handle the property, collect the rents, sell and dispose of it, and particularly provided that the trustees should collect all revenue from the trust estate, as well as the proceeds from the sale of any of the trust property and distribute it to the unitholders.

The trust instrument authorized the trustees to fill all vacancies in the office of trustees and amend the terms of the trust. It provided that the unitholders should have no vote, nor any control over the trust or the trustees, and that absolute control and discretion was vested in the trustees to manage and control the trust according to their own best judgment.

It also provided that the unitholders should have no interest by virtue of their certificates in the corpus of the estate, but merely the right to participate in the earnings and profits of the trust estate when realized in money.

Of the four hundred units less than fifty were sold to others than the creators of the trust.

After its creation, in May, 1922, the trust drilled a well, produced oil from which some returns were derived, and in January, 1923, it sold its properties to the Magnolia Oil Company for the sum of $200,000, and thereafter the trustees ceased the active management of the trust, and its affairs were wound up by the bookkeeper, Holmesly.

The circuit court, as said, affirmed the decision of this Board, holding that the taxpayer was a trust and not an association, whether looked at from the standpoint of what it might potentially do or from what it did in fact. In the *Extension Oil Co.* case, the trust was created to sink a test well and, after it had proved productive, the property was sold to the operating company and the trust within the year went out of business. Here, likewise, the petitioner sank two wells in unproven territory, found them productive, and sold the lease. We do not think it a significant difference that the petitioner here continued in existence to receive royalties on its property after the operation of the wells had been disposed of by sale. In both cases the trust instrument gave full and complete powers to the trustees, and excluded the " unitholders " or shareholders from any management or control. In both, certificates of interest were created, but in the *Extension Oil Co.* case some 50 out of 400 units went to outsiders, while here all the beneficiaries had held their interests from the beginning and themselves created the trust. As was suggested by the circuit court in the *Extension Oil Co.* case, and we hold the same opinion now, too close a scrutiny of the purposes of the petitioner as set out in the trust instrument—especially in the light of the testimony of petitioner's secretary and treasurer that the seven settlors of the trust really entertained no such intentions—would be a surrender to formalism; and that a regard to the realities of the case must take fully into account what was done in fact. Viewing petitioner thus, we are satisfied that it should not be classified as a business trust.

Respondent contends, however, that the present case falls within the rule of *Little Four Oil Co.* v. *Llewellyn*, 35 Fed. (2d) 149, and *Willis* v. *Commissioner*, 58 Fed. (2d) 121. It is significant that the circuit court in the *Little Four Oil Co.* case took as its test " whether the trust is a business concern and the trustees are operating it in active business for profit." It then recited the essential facts with respect to the creation of the trust by four men, the issuance of beneficial shares and the general control exercised by the trustees—facts similar to those presented here. The court concluded that the character of the trust was not to be determined by the powers of trustees or stockholders, " but by what the trust was acually doing through its trustees." Here, in the fact of the taxpayer's actual operations, lies the important difference between that case and this, for the

court had previously in its opinion quoted the taxpayer's admission as to its activities:

The trust (in this case) was created for the purpose of buying and selling real estate and mining and drilling for oil and gas thereon. * * * The trust engaged in business pursuant to the purpose as set forth in the declaration of trust, during the years in question.

"Buying and selling real estate" and "mining and drilling for oil" cannot properly be said to be the character of the petitioner's activities. The sinking of a test well, as was held in the *Extension Oil Co.* case, is very different from the continued operation of wells. Cf. *Twin Bell Oil Syndicate*, 26 B.T.A. 172, 176.

The respondent also relies on *Willis* v. *Commissioner, supra*, affirming 22 B.T.A. 564. In that case devisees of certain improved real property organized a trust for the administration of the property, since it could not then be equitably divided. But the trustees were much more than passive recipients of rent to be distributed to the beneficiaries. They sold some property, exchanged other property, tore down some houses, and erected an office building, in addition to collecting rents from the office building. The court said, "the question is to be determined from the facts showing what the trustees did in their handling of the property," and it therefore concluded as follows:

* * * The exchange of property as noted, and the erection of a new building at a considerable cost, was considered without question as a profitable investment. Judged by their course of action as shown, it would be reasonable to assume that the trustees would continue to deal with the property in like manner as long as the trust remained alive. Such acts, as enumerated, gave to the trust operations the character of an active business enterprise. * * *

Numerous decisions of the Board, including those cited by the petitioner, such as *C. W. Cowell Co.*, 21 B.T.A. 1274, and *G. F. Sloan*, 24 B.T.A. 61, have followed the same rule, where active operations were required of the trustees holding real estate. We do not see, however, that these cases have any application here.

In *Emery Co.* v. *United States*, 237 U.S. 28, arising under the Corporation Tax Law of August 5, 1909, the Supreme Court, in holding the respondent in error not subject to the tax, through Mr. Justice Holmes, said:

The question is rather what the corporation is doing than what it could do. * * * The claimants' characteristic charter function, and the only one that it was carrying on, was the bare receipt and distribution to its stockholders of rent from a specified parcel of land. Unless its bare existence as an intermediary was doing business, it is hard to imagine how it could be less engaged.

The cases of *Commissioner* v. *Atherton*, 50 Fed. (2d) 740; *Lansdowne Realty Co.* v. *Commissioner*, 50 Fed. (2d) 56; *Gardiner* v. *United States*, 49 Fed. (2d) 992; and *Dunbar* v. *Commissioner*, 65

Fed. (2d) 447, all support the same conclusion. Cf. *Tyson* v. *Commissioner*, 54 Fed. (2d) 29. The circuit court in the *Dunbar* case expressly rejected the argument that the later Treasury regulations, interpreting the *Hecht* case, properly include as associations those trusts with large powers but not actually engaged in carrying on. business. These cases all hold that the essential element is not what the trust may potentially do, but what it actually does in practice; and that the passive receipt of income by the trustees does not constitute doing business. We see no reason on the decided cases, therefore, why the petitioner does not fall within the rule of the *Extension Oil Co.* case, which it so closely resembles on its facts. The fact that the trust might run for twenty-one years is immaterial in view of the other facts, as the decided cases show. Nor is it important that in a single instance trust money, instead of being distributed, was reinvested in another lease. Such a single instance was disregarded in the *Gardiner* case, *supra.* The petitioner was in strict form a trust, carried on its only operations for test purposes, and thereafter lapsed into a mere agency for the collection of its royalties. In these circumstances we must conclude that after 1923 it did not carry on business, and, therefore, is not an association taxable as a corporation.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*